DANIEL ARTMANN and KAREN ARTMANN,   )
                 Plaintiffs,   )
v.                            )       CAUSE NO.: 2:11-CV-236-PRC
                            )
CENTER GARAGE, INC.,             )
                 Defendant.   )

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## OPINION AND ORDER FOR ENTRY OF FINAL JUDGMENT

This is an action by Plaintiffs Daniel Artmann and Karen Artmann (collectively "the Artmanns") against Center Garage, Inc. ("Center Garage") brought for breach of contract and other claims, resulting from a loan of $160,000 the Artmanns made to Center Garage, Inc. By agreement of the parties, this matter came before the Court for a bench trial on September 24 and 25, 2012. The Artmanns appeared in person and by counsel, Attorneys Russell Perdew and Ryan Holz. Center Garage appeared by its authorized representative, William Logothetis, and by counsel Patrick DeVine and Jessica Mullen.

After hearing all of the evidence, taking into account the credibility of the witnesses, and considering the parties' pleadings and the exhibits admitted into evidence, the Court hereby makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and orders entry of final judgment.

## PROCEDURAL BACKGROUND

On July 1, 2011, the Artmanns filed a Complaint against Center Garage, seeking money damages for Center Garage's failure to repay a loan of $160,000 made by the Artmanns. The Complaint asserts the following claims: Count 1–Breach of Contract; Count 2–Promissory Estoppel; Count 3–Unjust Enrichment; Count 4–Money Had and Received. In the Request for Relief, the

Artmanns ask for a judgment against Center Garage in the amount of $160,000, prejudgment interest at a rate of 8% under Indiana Code § 24-4.6-1-102, and attorneys fees and costs pursuant to Indiana Code § 34-52-1-1.

On September 6, 2011, Center Garage filed an Answer and Affirmative Defenses.

On September 24, 2012, the bench trial was commenced and opening statements were heard. That day and the following day, the Court heard evidence in the form of testimony and the admission of exhibits by way of the parties' Joint Trial Exhibits 1-25. The Artmanns presented their case-in-chief and rested. Center Garage then moved for a directed verdict on the Artmanns' prayer for attorney fees and costs under Indiana Code § 34-52-1-1, which the Court denied. Center Garage presented its case in chief. No rebuttal evidence was offered. Each side presented closing arguments. The Court ordered the parties to submit proposed findings of fact and conclusions of law on or before October 16, 2012.

The Artmanns timely submitted their Proposed Findings of Fact and Conclusions of Law with citations to the parties' Joint Trial Exhibits and the trial transcript. Center Garage also timely submitted its Proposed Findings of Fact and Conclusions of Law but included no citations to the admitted exhibits or the trial transcript in support of its proposed facts.

On October 16, 2012, the Artmanns also filed a Motion for Expedited Ruling and Judgment [DE 41].

The Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332(a)(1). The parties filed written notices of consent for the Magistrate Judge to conduct any and all proceedings including trial. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## STANDARD OF PROOF

This matter being a civil case, the Plaintiffs, the Artmanns, have the burden to prove their claims, alleged in their Complaint, by a preponderance of the evidence. The Defendant, Center Garage, has the burden to prove its affirmative defenses by a preponderance of the evidence.

## FINDINGS OF FACT

### A.  Owners, Officers, and Directors of Center Garage, Inc.

1.      The Schutz Living Trust owned 51% of Center Garage, Inc. corporate shares throughout 2009 and 2010.  John and Terri Schutz were the trustees of that trust.

2.      During that period, John Schutz ("Schutz") was President of Center Garage.  Schutz was also a member of the Board of Directors of Center Garage.

3.      Center Investments, Inc. ("Center Investments") owned the remaining 49% of Center Garage corporate shares throughout 2009 and 2010 up until December 12 or 13, 2010.  During that period, Mark Fentress ("Fentress") owned 40% of Center Investments, Michael Jablonski ("Jablonski") owned 5%, and Bryan Klein ("Klein") owned 10%.

4.      Fentress was the Senior Vice President of Center Garage throughout 2009 and through December 12 or 13, 2010.  On October 28, 2010, Fentress became a member of Center Garage's Board of Directors.

5.      Klein was the parts and services director of Center Garage in 2009 and 2010.

6.      In that position, Klein had the authority to hire, fire, and set the terms of employment for employees of Center Garage.

7.      He also had authority to enter into agreements on behalf of Center Garage, including purchase contracts.

8.     Klein had authority to sign checks for Center Garage from May 12, 2009 to December 13, 2010.

9.     Seeking loans on behalf of Center Garage was not within the scope of Klein's usual and ordinary duties for Center Garage.

10.    Klein was a vice president of Center Garage from October 28, 2010 until April 15, 2011.

11.    As a vice president and a member of the board of directors, Klein understood that he owed a fiduciary duty to Center Garage.

12.    During that time, Klein was also a member of Center Garage's Board of Directors.

13.    Klein was not a part of Center Garage's accounting or finance departments.

14.    Article IV (" Board of Directors"), Section 2 of Center Garage's By-Laws defines the "Duties" of the "Board of Directors," providing that "[t]he corporate power of this corporation shall be vested in the board of directors, who shall have the management and control of the business of the corporation. They shall employ such agents and servants as they deem advisable, and fix the rate of compensation of all agents, employees and officers." Joint Trial Exhibit 1. The Board of Directors did not hold regular meetings.

15.    Article IV ("Board of Directors"), Section 8 of Center Garage's By-Laws defines a "Quorum," providing that "[a]t any meeting of the board of directors, the presence of a majority of the members of the board then qualified and acting shall constitute a quorum for the transaction of any business except the filling of vacancies in the board of directors." *Id.*

16.    Article V ("Officers of the Corporation"), Section 3 of Center Garage's By-Law defines the role of "President," providing that

> [t]he president shall preside at all meetings of shareholders and directors, discharge all the duties which devolve upon a presiding officer, and perform such other duties as this code of by-laws provides, or the board of directors may prescribe. The

president shall have full authority to execute proxies in behalf of the corporation, to vote stock owned by it in any other corporation, and to execute, with the secretary, powers of attorney appointing other corporations, partnerships or individuals the agent of the corporation, all subject to the provisions of The Indiana General Corporation Act of 1929, as amended, the Articles of Incorporation and this code of by-laws.

*Id.*

17.     Article V ("Officers of the Corporation"), Section 4 of Center Garage's By-Laws defines the role of a "Vice President," providing that "[t]he vice-president shall perform all duties incumbent upon the president during the absence or disability of the president, and perform such other duties as this code of by-laws may require or the board of directors may prescribe." *Id.*

18.     Article V ("Officers of the Corporation"), Section 7 of Center Garage's By-Laws defines "Delegation of Authority," providing that

> [i]n case of the absence of any officer of the corporation, or for any other reason that the board of directors may deem sufficient, the board of directors may delegate the powers or duties of such officer to any other officer or to any director, for the time being, provided a majority of the entire board of directors concurs therein.

*Id.*

19.     Article V ("Officers of the Corporation"), Section 8 of Center Garage's By-Laws defines "Execution of Documents," providing that

> [u]nless otherwise provided by the board of directors, all contracts, leases, commercial paper and other instruments in writing and legal documents, shall be signed by the president and attested by the secretary. All bonds, deeds and mortgages shall be signed by the president and attested by the secretary. All certificates of stock shall be signed by the president or vice-president and the secretary or assistant secretary. All checks, drafts, notes and orders for the payment of money shall be signed by those officers or employees of the corporation as the directors may from time to time designate.

*Id.*

## B.  Center Garage's unpaid tax liability and financial situation

20.     In late 2010, Center Garage had over $137,000 in unpaid taxes due to the State of Indiana, and had other cash flow problems.

21.     Had Center Garage's taxes remained unpaid, the State of Indiana would have revoked Center Garage's retail merchant certificate.  Without a retail merchant certificate, Center Garage would have been forced to close.

22.     Center Garage sustained financial accounting losses for the months of November 2010, December 2010, and January 2011.

23.     Klein had access to the financial records of Center Garage and was aware of its financial condition.

## C.  Bryan Klein's initial communications with
## Center Garage about a loan from the Artmanns

24.     John Schutz told Klein, Fentress, and Jablonski that they were responsible for determining how to pay Center Garage's state tax liability.

25.     Schutz understood that Fentress had authority to make decisions on behalf of the dealership during the relevant time period.

26.     Neither Schutz nor anyone else at Center Garage placed any limitations on Klein's ability to talk to the Artmanns about borrowing money from them.

27.     Schutz understood that it was the responsibility of a separate entity, Center Investments, including Jablonski and Klein, to arrange for payment of the tax bill.

28.     Schutz testified that Klein did not have authorization to say that a loan from the Artmanns would be repaid in 60 days unless Klein had authorization from his partners Fentress and Jablonski.

29.     Schutz believed that Fentress and Jablonski had the authority to authorize Klein to enter into a loan transaction with the Artmanns.

30.     Schutz believed the partners of Center Investments would have had the ability to enter into the loan transaction with the Artmanns on behalf of Center Garage.

31.     Klein and Schutz discussed the possibility that Klein would obtain a loan for Center Garage from the Artmanns to address the unpaid taxes and other cash flow issues.  This conversation took place before Klein spoke to the Artmanns about the loan. Schutz placed no limitations on Klein's ability to agree to the terms of a loan from the Artmanns.

32.     Before Klein spoke to the Artmanns about a loan, he also discussed the possibility of a loan from the Artmanns with Fentress and Jablonski.

33.     Klein told Fentress and Jablonski that the only way he would ask the Artmanns for a loan is if the loan was a short-term loan.  Fentress and Jablonski agreed that any loan from the Artmanns would be short term.

### D.  Bryan Klein's communications with
### the Artmanns about a loan for Center Garage

34.     The Artmanns are the aunt and uncle of Klein's wife, Michelle Klein.  The Kleins have a close relationship with the Artmanns.  The Artmanns frequently speak to and spend time with the Kleins and their daughter.  Klein considers the Artmanns to be like family.

35.     In late November 2010, Klein talked to the Artmanns about getting a loan to help Center Garage pay its unpaid state tax liability.

36.     The Artmanns told Klein during that conversation that any loan would have to be short term.  Ultimately, the Artmanns agreed that they would loan Center Garage $160,000 but only if the money could be repaid within 60 days.

37.    During that late November 2010 conversation or soon thereafter, Klein agreed that Center Garage would repay the Artmanns' $160,000 loan within 60 days.

38.    Klein also told the Artmanns that he was going to discuss the loan and repayment period with Fentress, Jablonski, and Schutz before depositing the Artmanns' money into a Center Garage bank account.

39.    Klein assured the Artmanns that the money would not be deposited unless Fentress, Jablonski, and Schutz all agreed that the loan would be repaid within 60 days.

40.    The Artmanns would not have agreed to loan Center Garage $160,000 unless Bryan Klein promised that Center Garage would repay the loan within 60 days.

41.    The Artmanns believed that Klein had authority on behalf of Center Garage to agree to repay their loan within 60 days because they trusted him.

### E.  Klein's follow up communications with Center Garage about a loan from the Artmanns

42.    After Klein met with the Artmanns in late November 2010 but before December 6, 2010, Klein spoke again to Fentress and Jablonski.

43.    Klein told Fentress and Jablonski that the Artmanns were willing to loan $160,000 to Center Garage but only if it could be repaid within 60 days.

44.    Fentress and Jablonski agreed on behalf of Center Garage that the loan would be repaid within 60 days.

45.    On December 2, 2010, the Artmanns gave Klein a cashier's check made payable to Center Garage in the amount of $160,000.

46.    At that time, Schutz was out of town on vacation.

47.     Klein did not immediately deposit the Artmanns' cashier's check because he wanted to speak to Schutz in person and receive assurances from Schutz that the Artmanns' loan would be repaid in 60 days.

48.     On December 6, 2010, Klein and Schutz met at Center Garage in Schutz's office.  During that meeting, Klein told Schutz that the Artmanns were willing to loan Center Garage $160,000, but only if the loan could be repaid within 60 days.

49.     Klein told Schutz that Klein had the Artmanns' cashier's check in his possession and asked Schutz if Center Garage would repay the loan within 60 days.

50.     Schutz responded by standing up, shaking Klein's hand, and agreeing that Center Garage would repay the loan within 60 days.

51.     Schutz also directed Klein to deposit the check into Center Garage's account and arrange for the tax liability to be paid.

52.     The Artmanns did not speak with anyone at Center Garage about the loan.

53.     At the time the loan was made, there was no written agreement about the terms of the loan.

### F. Center Garage's use of the loan proceeds

54.     Immediately after speaking with Schutz, Klein left Center Garage, traveled to DeMotte State Bank, and deposited the Artmanns' $160,000 cashier's check into checking and savings accounts belonging to Center Garage.  Klein deposited $137,364.21 into Center Garage's checking account. Klein deposited the remaining $22,635.79 into Center Garage's savings account.

55.    From the checking account, Klein wrote a check to DeMotte State Bank in the amount of $137,364.21 for issuance of two cashier's checks to the Indiana Department of Revenue, one for $113,884.33 and the other for $23,465.88.[1]

56.    Klein gave the two cashier's checks to Bill Logothetis. Soon thereafter, Logothetis used the cashier's checks to pay Center Garage's outstanding tax liabilities.

57.    That payment enabled Center Garage to avoid losing its retail merchant certificate and closing its doors.

### G.  Bryan Klein's expectations regarding Center Garage's ability to repay Artmanns' loan

58.    In late 2010, Center Garage was working on obtaining a capital infusion of approximately $700,000 from a mortgage loan on the land where Center Garage was located.

59.    Although the land belonged to a trust controlled by John and Terri Schutz, the Schutzes intended to invest the proceeds of the mortgage loan into Center Garage.

60.    Klein learned that Center Garage was working on this capital infusion before he spoke to the Artmanns about a possible loan to Center Garage.

61.    Klein expected that the proceeds from the capital infusion would be used to repay the Artmanns.

62.    The mortgage loan closed in late December 2010 or early January 2011, and loan proceeds of approximately $650,000 were paid to Center Garage.

63.    Center Garage used the proceeds to pay off certain other creditors.

64.    Center Garage could have used the funds to repay the Artmanns but opted not to do so.

---

[1] The Court recognizes that $113,884.33 and $23,465.88 total $137,350.21 and not $137,364.21. There is no explanation in the record for this $14 difference in amount.

## H. Bryan Klein's post-loan communications with
## Center Garage regarding the Artmanns' loan

65.     On December 12 or 13, 2010, Schutz foreclosed Center Investment's ownership interest in Center Garage.

66.     At the same time, Schutz terminated Fentress' employment with Center Garage, as well as the employment of numerous other individuals associated with Center Investments.

67.     In response to these terminations, Klein asked Schutz for a meeting to discuss Klein's future with Center Garage and the Artmanns' loan to Center Garage.

68.     On or around December 13 or 14, 2010, Klein attended a meeting at the office of Center Garage's attorney Stuart Friedman ("Friedman").

69.     Present at the meeting were Klein, Michelle Klein, Friedman, Kirk Pinkerton, Schutz, and Terri Schutz.

70.     During the meeting, Friedman agreed to draft a promissory note to memorialize the terms of the Artmanns' loan to Center Garage.

71.     As part of his preparation of that note, Friedman asked Klein what the terms of the loan were. Klein told Friedman that the loan had a 60-day repayment term.

72.     This conversation took place in the presence of Schutz, and Schutz never corrected Klein or disputed that Center Garage had agreed to a 60-day repayment.

73.     Klein resigned his employment by Center Garage around May 13, 2011.

74.     Klein thereafter sought unemployment benefits. Center Garage challenged Klein's right to such benefits. After hearing the dispute on July 11, 2011, the administrative law judge found that Klein's decision to leave Center Garage was reasonable, in part, because Center Garage failed to repay the Artmanns' loan within 60 days "as agreed." *See* Exh. 17, p. 2.

### I. Center Garage's failure to repay the loan

75. Center Garage, Inc. did not repay the Artmanns within 60 days of receiving the loan.

76. Center Garage has not repaid the Artmanns any of the $160,000 loan.

77. On April 12, 2012, Klein emailed Schutz and Friedman regarding the loan. In the email, Klein represented that he had met with Daniel Artmann about the loan and that Daniel Artmann wanted a repayment schedule along with a promissory note.

### J. Center Garage's acknowledgment of its debt to the Artmanns

78. At some point, Schutz executed a handwritten note on behalf of Center Garage acknowledging that Center Garage received the $160,000 loan from the Artmanns and that he would pay them back in full plus 6% interest per month.

79. On May 1, 2011, Schutz unilaterally executed a typed promissory note on behalf of Center Garage and in favor of the Artmanns acknowledging Center Garage's receipt of the $160,000 and its repayment obligation.

80. In the May 1, 2011 promissory note, Center Garage unilaterally promised to repay the loan with an annual interest rate of 6% with the principal obligation due by April 15, 2014. The Artmanns did not and have not since agreed to such repayment terms.

### K. Center Garage's repayment under the unilateral promissory note

81. Center Garage is currently engaged in negotiations to sell all of its assets to a third-party buyer.

82. This asset sale will result in Center Garage going out of business.

83. Center Garage will use the proceeds of the sale to pay its secured creditors and tax liabilities in full.

84. Any amounts remaining will be paid pro rata to unsecured creditors.

85. Center Garage cannot guarantee that the unsecured creditors will be paid in full.

86. Center Garage has received a signed letter of intent from the third-party purchaser to buy the assets, signed a definitive agreement with the purchaser, and the transaction has been submitted to Chrysler for approval.

87. Center Garage has a target closing date for the transaction in mid-November 2012.

88. Once the transaction closes, Center Garage will cease to operate and all of the assets from Center Garage will be transferred to the buyers.

89. Center Garage has made monthly interest-only payments to the Artmanns under the May 1, 2011 promissory note. The Artmanns have not cashed any of those checks that they have received.

### CONCLUSIONS OF LAW

### A. Count 1 - Breach of Contract

The essential elements of a breach of contract claim under Indiana law are the existence of a contract, a breach of that contract, and damages resulting from the breach. *Corry v. Jahn*, 972 N.E.2d 907, 913 (Ind. Ct. App. 2012).

*1. Existence of a Contract*

A contract exists when one party makes an offer, the other party accepts the offer, and consideration is exchanged. *Homer v. Burman*, 743 N.E.2d 1144, 1146 (Ind. Ct. App. 2001) (citing *Bain v. Bd. of Trs.of Starke Mem'l Hosp.*, 550 N.E.2d 106 (Ind. Ct. App. 1990)).

a. Offer

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) (quoting Restatement (Second) of Contracts § 24 (1981)). During their November 30, 2010 conversation with Klein, the Artmanns

manifested a willingness to lend Center Garage $160,000 in exchange for Center Garage's promise

to repay the loan within 60 days. The Artmanns further manifested that willingness by giving Klein

a cashier's check made payable to Center Garage for $160,000 once Klein repeated Schutz's

reassurances that the loan would be repaid within 60 days.

b.     Acceptance

Center Garage then accepted the offer. Under Indiana law, an agent may bind a principal to

an offer or acceptance if the agent has actual authority, inherent authority, or apparent authority. *See*

*Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001). When an agent lacks authority to accept

an offer, a principal may subsequently ratify an agent's acceptance of an offer. *Heritage Dev. of Ind.,*

*Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 889 (Ind. Ct. App. 2002).

1)     Actual authority

Klein had actual authority to accept the Artmanns' offer. "Actual authority is created 'by

written or spoken word or other conduct of the principal which, reasonably interpreted, causes the

agent to believe that the principal desires him so to act on the principal's account.'" *Menard, Inc.*

*v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000) (quoting *Scott v. Randle*, 697 N.E.2d 60, 66

(Ind. Ct. App. 1998)). The reasonable belief of the agent, not the principal, determines whether there

is actual authority. *Scott*, 697 N.E.2d at 66. Actual authority can be express or implied. *Id*. Implied

authority arises "if the agent is reasonable in drawing an inference from the principal's actions that

the principal intended to confer authority." *Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1302

(Ind. 1998). Implied authority can be created by the principal's acquiescence to the agent negotiating

on the principal's behalf. *Scott*, 697 N.E.2d at 66-67 (finding the principals bound by settlement

approved by the agent where "at no time did they express any type of disagreement or discomfort"

with the agent negotiating on their behalf, so principals "implicitly consented to the Agreement through their acquiescence").

In this case, Klein was given both express and implied authority to accept the loan from the Artmanns for Center Garage. Before Klein spoke to the Artmanns about the loan, Center Garage's principal decision makers, including Schutz, Fentress, and Jablonski, authorized or at the very least acquiesced to Klein negotiating a loan with the Artmanns on behalf of Center Garage. No restrictions were placed on Klein's authority to negotiate or the terms to which he could agree. They expressly and impliedly authorized Klein to reach an agreement with the Artmanns, and, thus, Center Garage is bound by the terms of the agreement that Klein reached.

Once Klein obtained the check from the Artmanns in early December 2010, Klein received additional express authority from Fentress, Jablonski, and Schutz to accept the loan as well as to accept the 60-day repayment term. After obtaining the check, Klein told Fentress and Jablonski that the Artmanns would lend Center Garage $160,000 if the loan could be repaid within 60 days. Fentress and Jablonski agreed to those terms. At a December 6, 2010 meeting in Schutz's office, Klein informed Schutz of the terms of Artmanns' offer–a $160,000 interest-free loan with repayment in 60 days–and Schutz explicitly accepted those terms and authorized Klein to deposit the money. On that express authority, Klein accepted the Artmanns' offer on behalf of Center Garage by depositing the loan proceeds into Center Garage's account.

### 2) Inherent authority

As for inherent authority, "[o]n occasion, Indiana has taken an expansive view of apparent authority, including within the discussion the concept of 'inherent agency power.'" *Menard, Inc.*, 726 N.E.2d at 1211 (citing *Koval*, 693 N.E.2d at 1301). Inherent authority is "status based," meaning it "originates from the customary authority of a person in the particular type of agency relationship

so that no representations beyond the fact of the existence of the agency need be shown." *Menard, Inc.*, 726 N.E.2d at 1211 (internal quotation marks and citations omitted) (holding that the corporation's president possessed inherent authority to bind the corporation, even though the board of directors did not approve the transaction, where the president accepted an offer in a written agreement in which he represented that he had the requisite authority to bind the corporation). A corporate agent's inherent authority is defined by the position of the agent in the corporation. *See Houser v. State*, 661 N.E.2d 1213, 1217 (Ind. Ct. App. 1996) (finding, in the context of a criminal case for conspiracy to commit theft, that the account manager of the victim company was an agent of the victim company, reasoning that, at the very least, "because he had authority to sign the checks and to apprise the company's president as to the check's necessity, [he] had apparent or implied authority to act as an agent on behalf of the company"). Directors and officers of a corporation possess broad inherent authority. *See Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 138 (Ind. 2006) ("In the case of a corporation, the legal entity acts through its directors and officers. Thus, when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself."); *Cmty. Care Ctrs., Inc. v. Ind. Dep't of Pub. Welfare*, 468 N.E.2d 602, 604 (Ind. Ct. App. 1984) ("The law recognizes that the officers are the means, the hands and the head, by which corporations normally act.") (quotation marks omitted).

In *Menard*, the president had operated the company for many years without significant input from or oversight by the board of directors. 726 N.E.2d at 1209. In addition, the document the president signed that bound the corporation contained a representation that "[t]he persons signing this Agreement on behalf of the Seller are duly authorized to do so and their signatures bind the Seller in accordance with the terms of this Agreement." *Id*. at 1210. In concluding that the president had inherent authority, the Indiana Supreme Court considered whether three conditions were met: (1) if

the president "acted within the usual and ordinary scope of his authority as president," (2) if the other contracting party "reasonably believed that [the president] was authorized to contract for the sale and purchase of [his corporation's] real estate," and (3) if the other contracting party "had no notice that [the president] was not authorized to sell the 30-acre parcel without Board approval." *Id*. at 1212-13.

In the instant case, seeking loans on behalf of Center Garage was not within the usual and ordinary scope of Klein's duties. He had only recently become vice president. Moreover, when Daniel Artmann was asked at trial why he believed that Klein had the authority to make the agreement for the loan with a sixty-day repayment term, his response was essentially because the Artmanns trusted Klein as a family member and as an honest person. *See* Pl. Exh. A, p. 121 (Daniel Artmann dep.). The Artmanns offered no testimony that they believed he was authorized to enter into the loan agreement because of his position as vice president and a board member. Klein did have authority to write checks on behalf of Center Garage and he did have authority, as the parts and service director, to hire and fire employees and set the terms of their employment and to make business decisions on behalf of Center Garage as they related to the parts and service department. However, seeking loans on behalf of Center Garage was not within the scope of Klein's usual and ordinary duties for Center Garage. Thus, the Court finds that Klein did not have implied authority to enter into the loan.

3)      Apparent authority

"[A]pparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent." *Isaac*, 751 N.E.2d at 675 (citing *Menard*, 726 N.E.2d at 1210). The Indiana Supreme Court in *Isaac* recognized its earlier description of apparent authority: "It is essential that there be some form of communication, direct or indirect,

by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship." *Id.* (citing *Pepkowski v. Life of Indiana Ins. Co.*, 535 N.E.2d 1164, 1166-67 (Ind. 1989)) (internal citations omitted).

The principal's manifestations "need not be in the form of direct communications." *Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'rs & Land Surveyors, Inc.*, 852 N.E.2d 27, 32-33 (Ind. Ct. App. 2006) (quotation marks omitted) (quoting *Isaac*, 751 N.E.2d at 676). Rather, apparent authority exists where the principal "place[s] . . . the agent in a position to perform acts or make representations which appear reasonable to a third person . . . ." *Id.* at 32 (quotation marks omitted). Accordingly, apparent authority can exist where the principal "places an agent in the position of sole negotiator on his behalf [so that] it may be reasonable for the third person to believe that the agent possesses authority to act for the principal." *Scott*, 697 N.E.2d at 67 (finding that, because an attorney had entered his appearance on behalf of each member of the entity and because each member was fully aware of the attorney's attempts to negotiate a final settlement on their behalf, the members of the entity put their attorney in a position such that counsel for the opposing party reasonably believed that the attorney possessed authority to act on behalf of the members of the entity).

In this case, no communications, either direct or indirect, were made by Center Garage to the Artmanns regarding Klein's authority to enter into the loan agreement. The only communications to the Artmanns regarding the authority given to Klein by Schutz, Fentress, and Jablonski to enter into the loan agreement were made by Klein. Unlike in *Quality Foods*, in which the agent had been identified by the principal on a zoning amendment application as the "Applicant's Registered Land Surveyor," 852 N.E.2d at 32, in *Isaac* in which the plaintiff had done business with an insurance company's employee that the insurance company held out as its employee, or in *Farm Bureau Mutual*

*Ins. Co. v. Coffin*, 186 N.E. 2d 180 (1962), in which the insured called his auto insurer's home office and was connected with an employee to assist him with a specified service, the Artmanns were not in contact with Klein by any action, direct or indirect, between the Artmanns and Center Garage. Klein initiated the contact with the Artmanns, and all communications regarding the loan were between Klein and the Artmanns. The Artmanns did not contact Center Garage nor were they ever contacted by anyone at Center Garage other than Klein. "It is well settled that the existence of an agency relationship or an agent's authority may not be predicated solely upon the declarations of the alleged agent." *Heritage Dev. of Ind., Inc.*, 773 N.E.2d at 889 (citing *Johnson v. Blankenship*, 679 N.E.2d 505, 510 n. 4 (Ind. Ct. App. 1997)). Thus, Klein did not have apparent authority to enter into the loan agreement.

4) Ratification

In addition to Klein's actual authority to enter into the loan agreement, Center Garage ratified Klein's acceptance of the Artmanns' offer. "A principal will be bound by a contract entered into by the principal's agent on its behalf regardless of the agent's lack of authority if the principal subsequently ratifies the contract as one to which he is bound." *Heritage Dev. of Ind., Inc.*, 773 N.E.2d at 889 (citing *Beneficial Mort. Co. of Indiana v. Powers*, 550 N.E.2d 793, 796 (Ind Ct. App. 1990)). "[R]atification may be express, where the principal explicitly approves the contract, or implied, where the principal does not object to the contract and accepts the contract's benefits." *Id.* (same).

Before depositing the $160,000 in Center Garage's bank account, Klein informed Fentress, Jablonski, and Schutz that the Artmanns were expecting repayment in 60 days. All three individuals authorized Klein to deposit the money into Center Garage's account and use the money to pay Center Garage's tax obligations. Not one of those individuals told Klein that Center Garage could not accept

the money on those terms.  In addition, after the money was deposited, Klein told Friedman, during the meeting in Friedman's office, in the presence of Schutz, that the Artmanns expected repayment within 60 days.  Schutz did not object to the repayment term at that time; in fact, he made no comment at all.

A party is not permitted to ratify only select provisions of a contract; acceptance of some contractual benefits entails ratification of the entire contract.  *Indiana Ins. Co. v. Margotte*, 718 N.E.2d 1226, 1229 (Ind. Ct. App. 1999) ("When a party ratifies a contract, he cannot ratify only select provisions but must ratify the whole contract.").  In other words, a party cannot accept payment under a contract while simultaneously rejecting the repayment terms of that same contract.  *See id.* at 1229-30.  Knowing the terms of repayment, Center Garage chose not to return the money to the Artmanns even when an approximately $650,000 capital infusion was received in late 2010 or early 2011.  As a result, Center Garage accepted the benefit from the Artmanns.  Under Indiana law, Center Garage cannot simply pick those parts of the contract it likes (the $160,000 loan) while disregarding those parts it does not (the 60-day repayment term).  By accepting the loan proceeds which Klein obtained, Center Garage also accepted the 60-day repayment period.

c.    Consideration

To constitute consideration, there must be a benefit accruing to the promisor or a detriment accruing to the promisee.  *Ind. Dep't of State Revenue v. Belterra Resort Ind., LLC*, 935 N.E.2d 174, 179 (Ind. 2010).  Center Garage, in exchange for its promise to repay the loan in 60 days, received a benefit from the Artmanns in the form of the $160,000 interest-free loan.  The Artmanns suffered the corresponding detriment of providing the $160,000 interest-free loan to Center Garage.

*2. Breach*

A breach of contract occurs when one party fails to perform all of its contractual obligations. *Breeding v. Kye's Inc.*, 831 N.E.3d 188, 191 (Ind. Ct. App. 2005) (citing *Worrell v. WLT Corp.*, 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995)). In early December 2010, Center Garage agreed to repay the Artmanns' $160,000 loan within 60 days. The Artmanns advanced the $160,000 loan proceeds on the basis of the promise. Center Garage did not repay the loan within 60 days. As of October 16, 2012, Center Garage has not repaid any of the principal. Accordingly, Center Garage has breached the contract.

*3. Damages*

In a breach of contract action, damages consist of the benefit lost as a result of the breach. *Potts v. Offutt*, 481 N.E.2d 429, 434 (Ind. Ct. App. 1985). Here, because Center Garage has not repaid any principal on the loan, the Artmanns have been damaged in the amount of $160,000.

*4. Conclusion*

The Court finds that the Artmanns have met their burden of demonstrating by a preponderance of the evidence that they and Center Garage entered into a contract for a loan of $160,000 by the Artmanns to Center Garage to be repaid within 60 days, that Center Garage breached the contract when it did not repay the loan within 60 days, and that the Artmanns have suffered damages in the amount of $160,000 as a result of Center Garage's breach of contract.

As a result, the Court finds that it need not consider the alternate theories of recovery alleged by the Artmanns in their Complaint, namely promissory estoppel, unjust enrichment, and money had and received.

## B.  Prejudgment Interest

Under Indiana law, the Artmanns are entitled to prejudgment interest. "The award of prejudgment interest is founded solely upon the theory that there has been a deprivation of the plaintiff's use of money or its equivalent and that unless the interest is added, the plaintiff cannot be fully compensated for the loss suffered." *Fairmont Homes, Inc. v. Bluelinx Corp.*, No. 3:09-CV-323, 2011 WL 4729877, *8 (N.D. Ind. Oct. 4, 2011) (citing *Crawford Cnty. Cmty. Sch. Corp. v. Enlow*, 734 N.E.2d 685, 692 (Ind. Ct. App. 2000)).  Pursuant to Indian Code § 24-4.6-1-102, an award of prejudgment interest at the rate of eight percent (8%) per annum until payment of judgment is appropriate.  Interest commences at the time the principal payment would have come due. *Bd. of Works of the City of Lake Station, Ind. v. I.A.E., Inc.*, 956 N.E.2d 86, 95-96 (Ind. Ct. App. 2011); *Indianapolis Mach. Co., Inc. v. Cohen*, 378 N.E.2d 931, 935-36 (Ind. Ct. App. 1978).  Absent a contractual agreement by the parties, interest should be calculated as simple interest. *I.A.E., Inc.*, 956 N.E.2d at 96 (interpreting Ind. Code § 24-4.6-1-104).

In this case, the $160,000 principal balance was due from Center Garage on February 4, 2011 (60 days after the $160,000 cashier's check was deposited on December 6, 2010).  At 8% per annum, the prejudgment per diem is $35.07.  Thus, as of the date of this Order, October 18, 2012, the Artmanns are due $21,813.54 in prejudgment interest, with that amount increasing by $35.07 for each day between the date of this Order and the date judgment is entered.

## C.  Attorney Fees

The Artmanns' Complaint seeks attorneys fees and costs pursuant to Indiana Code § 34-52-1-1, which provides, in relevant part:

> (b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
(3) litigated the action in bad faith.

Ind. Code § 34-52-1-1(b). This Court has recently found that Indiana Code § 34-52-1-1 is inapplicable in federal court. *See Williams v. State Farm Ins. Co.*, No. 2:09-CV-177, 2011 WL 2111988, *2 (N.D. Ind. May 26, 2011) (C.J. Simon) (finding that this statute is procedural rather than substantive because it allows for an award of attorney fees based on the conduct of the parties and not on the underlying merits of the claim and, thus, that the statute does not fall within the general rule established by the United States Supreme Court that state law governs an award of attorney fees in a diversity case at least "where the state law does not run counter to valid federal statute or rule of court") (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 259 n.31 (1975)). Notably, the Artmanns submit no findings of fact or conclusions of law in support of this request for attorney fees. The Court dismisses any claim by the Artmanns for attorneys fees under § 34-52-1-1(b).

## CONCLUSION

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that judgment be entered on the Complaint in favor of Plaintiffs Daniel Artmann and Karen Artmann and against Defendant Center Garage, Inc. in the amount of $160,000, with prejudgment interest thereon in amount of $21,813.54 through the date of this Order plus an additional $35.07 per day until judgment is entered.

The Clerk of this Court is **DIRECTED** to enter final judgment accordingly.


The Court **DENIES as moot** Plaintiffs' Motion for Expedited Ruling and Judgment [DE 41].

So ORDERED this 18th day of October, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record